**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| SUZLON INFRASTRUCTURE, LTD., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-2206 |
| | § | |
| DAVID PULK, JESUS BAIZA, | § | |
| PROSHIPINE, INC., AND | § | |
| E-P TEAM, INC., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

In this litigation, the plaintiff, Suzlon Infrastructure, Ltd., asserts claims against the defendants, E-P Team, Inc., ProShipLine, Inc., David Pulk, and Jesus Baiza, related to their conduct after the termination of an agreement under which E-P Team was to serve as Suzlon's port agent. (Docket Entry No. 1). Before filing this action, Suzlon had commenced arbitration in Singapore against E-P Team under an arbitration clause contained in that agreement. ProShipLine is also a party to that arbitration. In this litigation, the defendants have filed a motion to dismiss or alternatively abate or stay pending the outcome of the arbitration. (Docket Entry No. 6). Suzlon replied, (Docket Entry No. 12); the defendants responded, (Docket Entry No. 14); Suzlon surreplied, (Docket Entry No. 16); and the defendants filed an additional response, (Docket Entry No. 22). Based on the pleadings; the motion, responses, and replies; the record; and the applicable law, this court denies the defendants' motion to dismiss but grants the alternative motion to stay this litigation pending the resolution of the Singapore arbitration. The reasons are explained below.

**I.     Background**

In April 2006, Suzlon, an Indian corporation engaged in shipping certain machinery to the United States, entered into a Sales and Logistics Services Agreement for port services with EP-Team. (Docket Entry No. 6-9, Sales and Logistics Services Agreement). EP-Team's duties under the Agreement included booking cargo, handling cargo at port, collecting freight monies, and disbursing freight monies on Suzlon's behalf. (Docket Entry No. 1, ¶ 7; Docket Entry No. 7, ¶ 7). Defendant David Pulk is the president and principal shareholder of EP-Team. (Docket Entry No. 1, ¶ 9). Pulk is also the president and principal shareholder of ProShipLine, which Pulk formed shortly after E-P Team entered into the Agreement with Suzlon. (*Id.*). The final named defendant, Jesus Baiza, is an officer of ProShipLine. (*Id.*).

To facilitate the receipt and disbursement of freight monies, ProShipLine opened an account at the Bank of America, referred to as the "Impress Account." (Docket Entry No. 6-7, ¶ 84). Both Pulk and Baiza had the authority to transfer funds in and out of the Impress Account. (Docket Entry No. 12, at 5).

For reasons that are in dispute, on July 5, 2007 Suzlon's General Manager for Logistics, Sanjivv Bangard, notified the defendants that Suzlon was terminating the Agreement. (Docket Entry No. 6-12, Ex. L, ¶ 16). The defendants allege that the termination materially breached the Agreement because Suzlon did not follow the specified notice procedures and because the termination was without cause. (Docket Entry No. 6, at 9). Suzlon responds that the defendants had themselves breached the Agreement before the July 2007 notice of termination was sent. On July 30, 2007, E-P Team informed Suzlon that neither it nor ProShipLine would perform the duties specified in the Agreement. (Docket Entry No. 12, at 6; Docket Entry No. 7, ¶ 10). Later, the defendants filed a number of maritime liens on Suzlon property. (Docket Entry No. 1, ¶¶ 19–21).

After July 2007, the defendants continued to collect cargo freight on Suzlon's behalf, depositing the money in the Impress Account. Suzlon alleges that the defendants have refused to transfer that money to Suzlon and that some of the money has been used to pay third parties, without Suzlon's knowledge or consent. (Docket Entry No. 7, ¶¶ 10, 12).

The parties dispute ProShipLine's relationship to E-P Team. The parties appear to agree that, with Suzlon's knowledge, ProShipLine fulfilled many of E-P Team's duties under the Agreement. Suzlon asserts that E-P Team created ProShipLine as a wholly owned subsidiary to perform E-P Team's duties under the Agreement. (Docket Entry No. 1, ¶ 8). The defendants deny that E-P Team wholly owns ProShipLine but assert that E-P Team assigned both its rights and liabilities under the Agreement to ProShipLine with Suzlon's consent. (Docket Entry No. 7, ¶ 6).

On October 9, 2007, Suzlon commenced arbitration proceedings in Singapore against E-P Team under the arbitration provision in their Agreement. (Docket Entry No. 1, ¶ 18). The arbitration provision states:

> If any dispute arises between the parties out of or in connection with the agreement whether in the nature of interpretation or meaning of any term hereof or as to any claim by one against the other, or otherwise, the same shall be referred to arbitration . . . and the arbitration shall be governed by the Arbitration Act for the time being in force. Unless the parties to the dispute mutually agree to the location of arbitration, the arbitration shall be held in Singapore.

(Docket Entry No. 6-9, Sales and Logistics Services Agreement, ¶ 15). A choice-of-law provision states that the Agreement "shall be construed and enforced in accordance with English Law." (*Id.* at ¶ 13).

In the arbitration, Suzlon summarized its claims as follows:

> [Suzlon's] claims against [E-P Team] for breach of contract and/or the repayment of commission/agency fees, the return of monies belonging to [Suzlon] wrongfully

3

> withheld by [E-P Team] and/or its agent and/or subcontractor, [ProShipLine], being the balance of cargo freight owed to [Suzlon] but collected by [E-P Team] and/or PSL and the payment of such further sums deducted unlawfully and/or in breach of contract from cargo freight collected by [E-P Team] and/or [ProShipLine].

Docket Entry No. 6-5, Points of Claim, at 5). The factual bases for Suzlon's claims in the arbitration include acts by E-P Team before and after the termination of the Agreement. Before E-P Team allegedly repudiated the Agreement, Suzlon alleges that E-P Team failed to develop sufficient personnel to perform the duties required under the Agreement; collected freight from a cargo shipment on the vessel *Belluga Fascination*, despite Suzlon's instruction not to do so; failed to pay invoices for stevedoring and other services to third parties, including Shippers Stevedoring, Ceres Marine Terminals, and Transatlantic Agencies; and made excessive and unauthorized payment to third-parties from the Impress Account. (*Id.* at 16–21). Suzlon alleges that after repudiating the Agreement, E-P Team collected and retained cargo freights due to Suzlon totaling $798,040.00; failed to facilitate a "winding down" according to the Agreement's provisions by refusing to pay Shippers Stevedoring, Ceres Marine Terminals, and Transatlantic Agencies and by encouraging them to file claims against Suzlon; and failing to transfer the funds in the Impress Account on request. Suzlon also demanded that E-P Team provide all bank statements related to the Impress Account; provide all records for all transactions related to the Impress Account; and return all funds in the Impress Account. (*Id.* at 18–19, 23–27).

The arbitration has produced an Interim Award addressing Suzlon's demand for an accounting of the Impress Account and the payment of all Impress Account funds. (Docket Entry No. 6-9, Interim Award, ¶ 7.1–7.2). The arbitrators found that Suzlon was entitled to a full accounting of the Impress Account but did not order the transfer of funds in that account to Suzlon because the arbitrators first had to resolve whether E-P Team was entitled to any deductions or

offsets. (*Id.* at ¶ 153, 156; Docket Entry No. 14-1, Ex. M).[1] The arbitrators also rejected E-P Team's claim that only ProShipLine, and not E-P Team, could be held liable under the Agreement because the parties had substituted ProShipLine for E-P Team. (*Id.* at ¶ 8–9, 30–31, 51–52). Instead, the arbitrators found that E-P Team had assigned its rights, but not its liabilities, under the Agreement to ProShipLine. (*Id.* at ¶ 154). The arbitrators also rejected E-P Team's argument that because ProShipLine's name was on the Impress Account, E-P Team could not comply with any order related to the Account. The arbitrators noted that "in such a case as the present, where the commercial interests and shareholding of the two entities are identical, the fact that the account is in [ProShipLine's] name does not by itself mean that [E-P Team] may not be ordered to provide the account." (*Id.* at ¶ 149). ProShipLine intervened in the arbitration as an assignee to assert claims against Suzlon. (Docket Entry No. 6-8, Ex. H).

On July 10, 2007, Suzlon filed this lawsuit. Suzlon asserts causes of action for conversion or embezzlement, tortious interference with existing contracts, wrongful attachments, violations of the Texas Theft Liability Act, TEX. CIV. PRAC. & REM. CODE § 134.001, *et seq.*, civil conspiracy, and violations of RICO, 18 U.S.C. § 1861, *et seq.* (Docket Entry No. 1, ¶ 26–41). The factual allegations supporting the claims are the defendants' failure to pay invoices for stevedoring and other services from Shippers Stevedoring, Ceres Marine Terminals, and Transatlantic Agencies; the maritime attachments; the defendants' transfer of funds from the Impress Account to third parties Intral, N.A., Inc. and CCS Cowlitz Clean Sweep, and the defendants' refusal to return the Impress Account funds to Suzlon. (*Id.* at ¶ 13, 19–25).

---

[1] The original text of the Interim Award did require that E-P Team and ProShipLine "pay the [Impress Account] monies to [Suzlon]." (Docket Entry No. 6-7, Interim Award at ¶ 156). But a subsequent email from the arbitrators deleted this portion of the order. (Docket Entry No. 14-1, Ex. M).

5

The defendants move to dismiss Suzlon's claims in this litigation, arguing that this court does not have subject-matter jurisdiction because the pending arbitration has not resolved ownership of the Impress Account and therefore Suzlon's federal-court claims based on its asserted ownership of those funds are not ripe. Suzlon responds that the Interim Award establishes its ownership of the Impress Account funds and that its claims to those funds are ripe. The defendants alternatively move to stay or abate this litigation pending the outcome of the Singapore arbitration. Suzlon responds that under the English law that controls the arbitration under the parties' choice-of-law clause in the Agreement, there is no basis to stay or abate this suit. Suzlon argues that its claims against ProShipLine, Pulk, and Baiza are not arbitrable because they are not signatories of the Agreement containing the arbitration clause. Suzlon also argues that it may pursue its litigation against all the defendants because the claims asserted in this litigation arise from the defendants' conduct after both parties had repudiated the Agreement, making these claims beyond the scope of the arbitration. Finally, Suzlon argues that under the English law that applies in the Singapore arbitration, the RICO claim cannot be adjudicated. Suzlon asks this court to hold that the Agreement is unenforceable as against public policy if it precludes Suzlon from pursuing its RICO claim.

Each argument and the responses are analyzed below.

## II.   The Motion to Stay

A district court must stay a lawsuit when one party demonstrates that any issue involved in the lawsuit is "referable to arbitration under an agreement in writing for such arbitration." 9 U.S.C. § 3; *Tittle v. Enron Corp.*, 463 F.3d 410, 417 n.6 (5th Cir. 2006) (noting that "a stay is mandatory at the request of a party if the dispute is arbitrable"). If a mandatory stay under section 3 is not applicable, a court may still exercise its discretion to stay litigation, even as to claims involving nonsignatories, pending the outcome of arbitration, as a means of controlling and managing the

6

docket. *See Complaint of Hornbeck Offshore (1984) Corp.*, 981 F.2d 752, 755 (5th Cir. 1993) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n.23 (1983)). A district court's discretionary authority to issue a stay is "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 243 (5th Cir. 2009) (citing *Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co.*, 761 F.2d 198, 204 n.6 (5th Cir. 1985).[2]

The Fifth Circuit has stated that generally, the mandatory stay provision of the FAA does not apply to those who are not parties to a written arbitration agreement. *See Adams v. Georgia Gulf Corp.*, 237 F.3d 538, 540 (5th Cir. 2001). However, "the clarity of this rule denying the applicability of the mandatory stay provision to non-parties has been muddied" by recent cases. *Id.* In *Adams,* the court summarized these cases:

> In *Harvey v. Joyce*, 199 F.3d 790 (5th Cir. 2000) and *Subway Equip. Leasing Corp. v. Forte*, 169 F.3d 324 (5th Cir. 1999), we applied the stay provision to non-parties because the issues presented in the nonparty-party litigation if litigated would have rendered the arbitration redundant and thwarted the federal policy favoring arbitration. . . . In *Harvey* and *Subway*, however, we were confronted with exceptional circumstances. In *Harvey*, the parties to the arbitration agreement were all shareholders in a company, CTC, the non-party to the agreement. Joyce, one of the parties to the agreement, had been named along with CTC as a defendant. The allegations of the lawsuit against CTC were based upon actions taken by Joyce on behalf of CTC. . . . As a result, we found that allowing litigation to proceed could have "a critical impact in the Joyce arbitration." Similarly, in *Subway*, we found that because the issues to be litigated by the non-parties were identical to the issues to be arbitrated by the parties allowing the litigation to proceed would harm the parties' rights to arbitrate. Because of these exceptional circumstances, we diverged from our general rule requiring party

---

[2] A district court has discretion to dismiss a case when "'all of the issues raised in the district court must be submitted to arbitration.'" *Apache Bohai Corp. v. Texaco China, B.V.*, 330 F.3d 307, 311 n.9 (5th Cir. 2003) (quoting *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992) (noting that the "weight of authority" supports but does not require dismissal).

7

>  status for the mandatory stay provision to apply, thereby creating tension in our case law.

*Id.* at 540–41 (internal citations omitted). In *Adams*, the court held that because the nonsignatory seeking a stay in that case did not show that allowing the litigation to proceed would impede the arbitration, there were no "exceptional circumstances" justifying a mandatory stay of the litigation under section 3. Because the nonsignatory would only be entitled to a discretionary stay, the denial of the stay was an interlocutory order over which the appellate court lacked jurisdiction. *Id.*

The important case law in the Fifth Circuit includes *Hill v. GE Power Systems, Inc.,* 282 F.3d 343 (5th Cir. 2002) and *Waste Mgmt., Inc v. Residuos Industriales Multiquam*, 372 F.3d 339 (5th Cir. 2004). In *Hill*, an energy company signed a memorandum of understanding with General Electric Power Systems, Inc. to develop two power plants and a gas storage facility. The energy company later signed a termination agreement ending the memorandum of understanding. The termination agreement contained an arbitration clause. General Electric Capital Corporation ("GECC") had entered into a separate agreement, which did not contain an arbitration clause, with the energy company to serve as the financial advisor to the project. The energy company brought identical claims against both General Electric Power Systems and GECC, alleging that they had conspired to withhold payments, stall financing, withhold information, and force the energy company to use certain equipment. *Id.* at 345–46. The district court granted General Electric Power Systems's motion to stay and compel arbitration but denied GECC's motion seeking the same relief because it was not a signatory to the agreement containing the arbitration clause. The Fifth Circuit reversed the denial of GECC's motion to stay. The Fifth Circuit found that GECC was entitled to a mandatory stay under the FAA because the claims against GECC were "inherently inseparable"

from the claims against General Electric Power Systems and permitting the suit "to go forward would undermine the arbitration proceedings." *Id.* at 348.

In *Waste Management*, the Fifth Circuit synthesized the precedents identifying the factors for deciding when a nonsignatory can obtain a mandatory stay of litigation under section 3 pending arbitration:

> [S]everal factors emerge for invoking § 3 on the application of a non-signatory: 1) the arbitrated and litigated disputes must involve the same operative facts; 2) the claims asserted in the arbitration and litigation must be 'inherently inseparable'; and 3) the litigation must have a 'critical impact' on the arbitration.

372 F.3d at 343. In *Waste Management.*, a signatory filed a lawsuit seeking contract damages from a nonsignatory. The same contract damages were at issue in an arbitration between the plaintiff and another signatory to the arbitration contract. *Id.* at 340–41. The Fifth Circuit found that the signatory's claims in the litigation were so closely related to the arbitration and would have such an impact on the arbitration as to make a stay mandatory under section 3. First, the major operative facts underlying the signatory's claims against the nonsignatory in the litigation were identical to those underlying the signatory's claims in the arbitration. Second, the signatory's claims in the arbitration and the litigation were inseparable because they sought to recover the same payment for a single alleged harm. Finally, allowing the litigation to proceed would "substantially impact" the arbitration because the arbitrator would be strongly influenced to follow the court's determination. *Id.* at 345.

The issue in this case is the relationship of the claims and counterclaims between Suzlon and the defendants in this case and the claims and counterclaims among Suzlon, E-P Team, and ProShipLine in the arbitration. The operative facts relating to the two proceedings are not identical, but they do overlap extensively. The arbitration arises out of the Suzlon/E-P Team Agreement,

9

which was performed by ProShipLine, and the parties' alleged repudiation and termination of the Agreement. The litigation focuses on the Impress Account, which arises out of the Agreement, and the maritime attachments, which arise out of the parties' repudiation and termination of the Agreement. The Singapore arbitration will resolve each party's damages related to the Agreement's repudiation and termination. The parties and evidence significantly overlap: Suzlon, E-P Team, and ProShipLine are parties in both proceedings, and the individual defendants in this litigation are officers of the corporate defendants and have testified in the arbitration.

Suzlon argues that the arbitration does not involve the same operative facts as the litigation because in the arbitration, it can only pursue its claims against E-P Team. Suzlon also argues that under English law, it may bring its claims against ProShipLine and the individual defendants in this court. In support, Suzlon relies on the declaration of an expert on English law, Nigel Jacobs. (Docket Entry No. 16-1, Jacobs Declaration). Jacobs states that "since [ProShipLine] [is] not a party to the Agreement (other than by way of assignment of E-P Team's own claims), it would follow that the Plaintiff's entitlement to pursue [ProShipLine] in a competent jurisdiction of their own choice would be unaffected by the assignment." (*Id.* at 3). Jacobs also states that because the individual defendants are not parties to the Agreement between Suzlon and E-P Team containing the arbitration clause, "[i]t follows that the arbitration clause simply does not encompass any claims to be brought by [Suzlon] against these non-contractual parties." (*Id.* at 4).

Although ProShipLine is not a signatory to the Agreement containing the arbitration clause, ProShipLine is an assignee of the Agreement and has intervened as a party to the arbitration proceeding. The Interim Award suggests that Suzlon will be able to seek relief against ProShipLine in the arbitration. In rejecting E-P Team's argument that it could not comply with any order related to the Impress Account because the Account named only ProShipLine, the arbitrators stated: "[I]n

10

such a case as the present, where the commercial interests and shareholding of the two entities are identical, the fact that the account is in [ProShipLine's] name does not by itself mean that [E-P Team] may not be ordered to provide the account." (Docket Entry No. 6-9, ¶ 149). Indeed, Jacobs's declaration states that under English law, as an assignee, ProShipLine may assert claims against Suzlon based on the Agreement, and in response Suzlon may assert its claims against ProShipLine "by way of the defence of set-off in response to any claim pursued by [ProShipLine] under the assignment." (Docket Entry No. 16-1, Jacobs Declaration, at 3).

Jacobs's declaration does not address whether, despite the fact that the individual defendants are nonsignatories, they may nonetheless obtain a stay of the litigation in this court because it is so closely related to the arbitration. The declaration cites no English law and merely states the obvious fact that nonsignatories to an agreement containing an arbitration clause are not bound to the clause in the same way as signatories. The declaration does not address whether under English law there may be a basis for enforcing the arbitration agreement as to the corporate and individual nonsignatories based on recognized contract or agency principles—including incorporation by reference; assumption; agency; veil-piercing/alter ego; estoppel; and third-party beneficiary—or direct-benefit estoppel. *See Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 358–59 (5th Cir. 2003) (overturning district court's ruling on enforcement of arbitration clause against nonsignatory based on alter ego theory because the district court failed to analyze all aspects of the relationship); *see also Hellenic Inv. Fund, Inc. v. Det Nortske Veritas*, 464 F.3d 514, 517–20 (5th Cir. 2006) (enforcing a forum-selection clause against a nonsignatory to the contract when the nonsignatory received direct and substantial benefits from the signatory's contract performance); *Wood v. PennTex Res., L.P.*, 458 F. Supp. 2d 355, 372–73 (S.D. Tex. 2006) (direct-benefits estoppel applied to compel arbitration against a nonsignatory that had not sued the signatory but had received

11

significant and direct benefits under the agreement containing the arbitration clause). Jacobs's declaration does not provide a basis to conclude that the litigation and arbitration involve different operative facts.

Suzlon also argues that this litigation does not involve the same operative facts as the arbitration because the federal court claims involve only the defendants' conduct after both parties repudiated the Agreement, while the arbitration relates to the breach of the Agreement. But according to Jacobs, Suzlon may assert claims in the arbitration involving E-P Team's conduct after the Agreement's repudiation because under a broad contractual arbitration clause such as the parties agreed to in this case, English law, like American law, allows parties to arbitrate all the claims related to and arising out of the parties' contractual relationship. (*Id.* at 10). *See Naru Phosphate Royalties, Inc. v. Drago Daic Interests,* Inc., 138 F.3d 160, 164–65 (5th Cir. 1998) (finding that arbitration clause covering all disputes "arising out of or in connection with" demonstrates that parties intend to arbitrate "all aspects of the relationship"); *Pennzoil Exploration and Prod. Co. V. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998) ("[A]rbitration should not be denied unless it can be said with positive assurance that arbitration clause is not susceptible of interpretation which would cover dispute at issue."). According to Jacobs, English law also allows claims for conversion and business torts involving the same operative facts as the claims Suzlon brings here. (Docket Entry No. 16-1, Jacobs Declaration, at 8–10).

Suzlon argues that the Singapore arbitration has already established its ownership of the Impress Account and has only left open the "set-off" owed to the defendants. The Interim Award states, "The Tribunal does not consider at least at this stage of the proceedings, that the claimant has established a right to receive payment of the money in the Impress Account, without any deductions." (Docket Entry No. 6-7, ¶ 153). But even if the Interim Award leaves unresolved only

the issue and amount of any deductions and set-off, those must be decided before this court can decide Suzlon's claims in the litigation. To resolve Suzlon's claims, this court would have to determine which funds in the Impress Account belong to Suzlon and which belong to the defendants. For example, if the set-off exceeds the amount of funds the defendants allegedly converted, then there is likely no conversion of these funds.

Even if the operative facts are not identical and the claims are not "inherently inseparable," the facts and claims significantly overlap. The first two *Waste Management* factors at a minimum weigh heavily in favor of a discretionary stay. Such a stay will allow Suzlon to arbitrate the issues relating to the parties' Agreement, its repudiation, and the Impress Account funds before litigating the remaining issues, which will involve much of the same evidence developed in the arbitration. The close relationship between the facts involved in the federal court claims and the arbitration claims counsels in favor of staying this litigation. *See Argus Media Ltd. v. Tradition Fin. Servs., Inc.*, 2009 WL 5125113, at *4 (S.D.N.Y. Dec. 29, 2009) (finding that litigation should be stayed because the arbitration could cover the claims, over the plaintiff's objection that those claims covered a different period); *Citgo Petro. Corp. v. M/T Bow Fighter*, Civ. Act. No. H-07-2950, 2009 WL 960080, at *7 (S.D. Tex. Apr. 7, 2009) (issuing a stay under the court's inherent authority because the claims in the litigation arose "from the same incident between two pairs of the same three parties" in the arbitration"); *Cobra North America, LLC v. Cold Cut Sys. Svenska AB*, 639 F. Supp. 2d 1217, 1226 (D. Colo. 2008) (staying litigation pending arbitration in Sweden because the arbitration's findings would aid the court in resolving the facts and the Swedish law relevant to the stayed litigation even though the plaintiff might not be a party to the Swedish arbitration); *Med-Im Dev., Inc. v. Gen. Elec. Capital Corp.*, 2008 WL 901489, at * 9 (S.D. Tex. Mar. 31, 2008) (granting

a discretionary stay because the litigation would "involve much the same evidence developed in arbitration").

The likely impact of this litigation on the Singapore arbitration provides another basis for a discretionary, if not a mandatory, stay. The arbitration should be faster and more efficient than the litigation, given that it has already proceeded past the Interim Award stage. But if this litigation proceeds faster than the arbitration, the risk identified in *Waste Management* could arise. Resolving Suzlon's federal court claims could resolve an issue the arbitrators indicated they intend to decide, the ownership of the Impress Account funds, making the decision of that issue in arbitration redundant. That risk provides additional reason to stay this litigation. *See Shores of Panama, Inc. v. Safeco Ins. Co. of Am.*, Civil Action No. 07-00602-KD-B, 2008 WL 4417558, at *7–8 (S.D. Ala. Sept. 29, 2008) (staying litigation pending arbitration because the litigation required reaching the merits of an arbitrable claim, thwarting the federal policy against rendering arbitration "redundant"); *see also Midland Walwyn Capital Inc. v. Spear, Leeds & Kellogg*, No. 92-2236, 1992 WL 249914, at *2 (S.D.N.Y. Sept. 22, 1992) ("Courts in this district have repeatedly granted stays pending arbitration where the nonarbitrable issues overlap the arbitrable issues, thus minimizing inconsistent results and conserving judicial resources.").

A discretionary stay of this litigation will also enable the court and the parties to benefit from the outcome of the arbitration. This effect does not weigh in favor of a mandatory stay under section 3, but does support a discretionary stay. *See Waste Mgmt.,* 372 F.3d at 343 ("The question is not ultimately one of weighing potential harm to the interests of the non-signatory, but of determining whether proceeding with litigation will destroy the signatories' right to a meaningful arbitration.").

Suzlon finally argues that it should be allowed to proceed with the litigation because it is the only proceeding in which it can pursue its RICO claim. Suzlon argues, and the defendants do not

14

dispute, that it cannot pursue its RICO claim in the arbitration because English law does not recognize a RICO cause of action. Suzlon argues that enforcing the parties' arbitration agreement in a way that causes the loss of the RICO claim would contravene public policy. Suzlon points to language from the Supreme Court's decision in *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985). In *Mitsubishi*, the court stated, "[I]n the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy." 473 U.S. at 628. Suzlon argues that the loss of RICO claims is similar to the loss of statutory remedies for antitrust violations and against public policy. The Fifth Circuit has rejected this reading of *Mitsubishi*:

> The plaintiffs protest that *Mitsubishi* and *Vimar Seguros* support their theory about combination forum selection/choice-of-law clauses extinguishing substantive rights. It is a strained reading of these decisions that they urge on us, however.
>
> In *Mitsubishi*, the Court ordered Japanese arbitration of an American automobile dealer's antitrust claims against its franchisor, notwithstanding that the foreign arbitrator might misapply U.S. law. The key to the decision was the same driving force that was behind *The Bremen* and *Scherk*: "concerns of international comity, respect for the capacities of foreign and transnational tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes. . . ." Nonetheless, in dictum, the Court stated that "in the event the choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy." Pointing to this statement, the plaintiffs urge the same conclusion the Ninth Circuit reached in *Richards*, that the General Undertaking's FS/COL clause should be condemned here.
>
> We do not read *Mitsubishi* so broadly. Setting aside the fact that it is dictum, the quoted statement, by its own terms, is limited to the antitrust context, as is *Mitsubishi* more generally.

*Haynsworth v. The Corp.*, 121 F.3d 956, 968 (5th Cir. 1997) (internal citations omitted).

To the extent Suzlon argues that its inability to pursue RICO claims in arbitration should allow it to pursue all claims it has asserted in this litigation because that inability makes the arbitration agreement unenforceable on public policy grounds, the argument is unpersuasive. This court must presume that the arbitration clause can be enforced. *Haynsworth,* 121 F.3d at 962 (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 9 92 S. Ct. 1907, 32 L. Ed. 2d 513 (1974)). "The presumption of enforceability may be overcome, however, by a clear showing that the clause is 'unreasonable under the circumstances.'" *Id.* at 963 (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972)). "Unreasonableness potentially exists where (1) the incorporation of the forum selection clause into the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement 'will for all practical purposes be deprived of his day in court' because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the forum selection clause would contravene a strong public policy of the forum state." *Id.* (citing *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595 111 S. Ct. 1522, 113 L. Ed. 2d 622 (1991)). Suzlon does not allege that the forum-selection clause was the product of fraud or overreaching or that the forum is of such grave inconvenience that Suzlon is deprived of its day in court. Suzlon's only argument is that the forum-selection clause is unenforceable because it deprives Suzlon of its RICO remedy, contravening public policy. Similarly in *Haynsworth*, the plaintiffs urged the court to void a forum-selection clause that deprived them of federal securities law remedies through the application of English law. The Fifth Circuit rejected this argument:

> The view that every foreign forum's remedies must duplicate those available under American law would render all forum selection clauses worthless and would severely hinder Americans' ability to participate in international commerce. We wholeheartedly adopt the Second Circuit's response to the plaintiffs' contention:

16

> It defies reason to suggest that a plaintiff may circumvent forum selection and arbitration clauses merely by stating claims under laws not recognized by the forum selected in the agreement. A plaintiff simply would have to allege violations of his country's tort law or his country's statutory law or his country's property law in order to render nugatory any forum selection clause that implicitly or explicitly required the application of the law of another jurisdiction. We refuse to allow a party's solemn promise to be defeated by artful pleading.

*Id.* at 969 (quoting *Roby v. Corporation of Lloyd's*, 996 F.2d 1353 (2d Cir. 1993)). In *Roby*, the court rejected an argument that the unavailability of RICO damages in the forum specified in the parties' arbitration agreement could make that agreement unenforceable on public policy grounds. *Roby*, 996 F.2d at 1365; *see also Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1299 n.9 (11th Cir. 1998) ("We will not invalidate choice clauses, however, simply because the remedies available in the contractually chosen forum are less favorable than those available in the courts of the United States. Instead, we will declare unenforceable choice clauses only when the remedies available in the chosen forum are so inadequate that enforcement would be fundamentally unfair."). The Fifth Circuit—and every circuit that addressed this issue except the Ninth Circuit—has reached the same conclusion about the unavailability of securities claims in the forum chosen in the parties' arbitration agreement, despite the added factor that the securities laws contain an antiwaiver provision. *Id.* at 960. Suzlon has made no argument as to why this court should reach a different conclusion with respect to RICO. *See Carnival Cruise Lines*, 499 U.S. at 595 ("In the absence of other considerations, the agreement to submit to arbitration or the jurisdiction of the English courts must be enforced even if that agreement tacitly includes the forfeiture of some claims that could have been brought in a different forum."). The record shows that while Suzlon may not pursue a RICO cause of action in arbitration, it may pursue claims and remedies arising from the facts it uses as the basis of the RICO claim.

In sum, even if the factors set out in *Waste Management* do not require a stay under section 3, those factors, on the present record, support a discretionary stay.

## III.     The Motion to Dismiss for Lack of Ripeness

Federal Rule of Civil Procedure 12(b)(1) governs challenges to a court's subject-matter jurisdiction.  "A case is properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case."  *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (quoting *Nowak v. Ironworkers Local 6 Pension Fund,* 81 F.3d 1182, 1187 (2d Cir. 1996)).  "Ripeness is a component of subject matter jurisdiction, because a court has no power to decide disputes that are not yet justiciable."  *Lopez v. City of Houston*, No. 09-20534, 2010 WL 3341643, at *3 (5th Cir. Aug. 26, 2010).  "In determining whether a matter is ripe for judicial review [the Fifth Circuit considers] 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Anderson v. School Bd. of Madison Cnty.*, 517 F.3d 292, 297 (5th Cir. 2008) (citing *Orix Credit Alliance, Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000) (internal quotation marks omitted)).  "Ripeness separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for judicial review."  *United Transp. Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000).  "Generally, issues are not ripe if 'further factual development is required.'"  *Anderson*, 517 F.2d at 297 (citing *Wolfe*, 212 F.3d at 895).

The defendants argue that this court should dismiss Suzlon's complaint for lack of ripeness, pointing to issues remaining to be decided in the arbitration.  The stay of the proceedings pending the resolution of the Singapore arbitration makes this issue moot.

**IV.     Conclusion**

The motion to dismiss is denied; the motion to stay is granted.  This case is administratively closed pending the conclusion of the arbitration.  The parties may reinstate this case to the active docket by motion filed within 14 days after the arbitration panel issues its final award.

SIGNED on September 10, 2010, at Houston, Texas.

                                                                          _____
                                                                                       Lee H. Rosenthal
                                                                          United States District Judge